UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| | | |
|---|---|---|
| ANDREW MASCIO, | ) | CASE NO. 1:17-cv-1606 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Andrew Mascio, seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act ("Act").  The parties have consented to my jurisdiction.  ECF Doc. 10.

Because the ALJ supported her decision with substantial evidence and because Mascio has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

## II.      Procedural History

On October 10, 2012, Mascio applied for disability insurance benefits and supplemental security income, alleging disability beginning May 1, 2009.  (Tr. 346, 353-354)  After the claims were denied initially on March 2, 2013 (Tr.148) and on reconsideration on May 3, 2013 (Tr. 170), Mascio requested a hearing.  (Tr. 248)  Administrative Law Judge ("ALJ") Susan G. Giuffre heard the case on July 16, 2014 (Tr. 109-145) and found Mascio not disabled in an October 31, 2014 decision.  (Tr. 194-217)  Upon Mascio's request for further review, the

Appeals Council vacated the ALJ's decision, and remanded the matter for further proceedings including a rehearing of the claims. (Tr. 218-224) The Appeals Council instructed the ALJ, among other things, to clarify whether Mascio's need to alternate between sitting and standing was medically supported and, if so, to specify the length of time and the frequency with which Mascio needed to alternate positions. (Tr. 219-220)

Following the remand order, ALJ Giuffre heard the case again on June 8, 2016. (Tr. 57-107) Mascio testified again as did a vocational expert, Bret Salkan. (Tr. 57) On July 11, 2016, ALJ Giuffre issued a second unfavorable decision. (Tr. 38-50) The Appeals Council denied Mascio's request for further review, rendering the ALJ's decision final. (Tr. 1-4) Mascio instituted this action to challenge the Commissioner's final decision.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Mascio was born on June 17, 1965 and was 51 years old when the ALJ issued her second decision. (Tr. 353) He completed high school and had some on-the-job training. (Tr. 113) He previously worked as a sales manager for a company that manufactured granite countertops and as a sales manager for a cabinet manufacturer. (Tr. 115-116) He also previously operated his own cabinetry company. (Tr. 117)

### B.    Medical Evidence

Mascio began experiencing back and neck pain in the mid-1990s. (Tr. 500) On January 29, 1999, an MRI showed a grade I spondylolisthesis of L5 on S1, with a broad based disc bulge, as well as disc dehydration at the L1-2 level. (Tr. 583) Dr. Steven Takacs, Mascio's primary care physician, diagnosed degenerative joint disease and lumbosacral radiculopathy in 2001. (Tr. 522-524) On December 1, 2004 an MRI of Macio's lumbar spine showed a right lateral disc protrusion at L4-5 moderately narrowing the right neural foramen and disc space narrowing at

L4-5 and L5-S1. (Tr. 585) An MRI of his hip was normal. (Tr. 584) A December 1, 2004 EMG study was also normal. (Tr. 587)

In 2005 and 2006, Mascio treated with Samuel K. Rosenberg, M.D., for back pain and underwent facet nerve block and epidural steroid injections. (Tr. 572-79, 594-601, 616-67, 784-785) A July 20, 2005 MRI of Mascio's cervical spine showed degenerative changes with bony foraminal narrowing on the left at C2-3 and C3-4. (Tr. 588)

Mascio saw Lisa Brown, M.D., on November 5, 2008. He was not taking any medication at the time. He reported a return of his back pain symptoms. Neuromuscular examination was grossly intact and his sensation and motor strength were intact. Mascio was able to rise from sitting to standing without difficulty. He had pain and difficulty with range of motion in his lumbar and cervical spine. Dr. Brown diagnosed facet arthropathy, thoracic back pain and cervical pain with a history of cervical spine disc disease and recommended facet blocks. She also ordered an MRI of Mascio's thoracic spine. (Tr. 783) The MRI, performed on November 7, 2008, showed a central disc osteophyte herniation at T5-6 deforming the ventral thecal sac and slightly flattening the ventral thoracic cord resulting in moderate canal stenosis and disc osteophyte protrusion and endplate spondylosis resulting in mild canal stenosis T6-7 to T10-11. (Tr. 589)

On November 8, 2012, following a four year gap in treatment, Mascio saw Martin Berger, M.D., at Metro Health Medical Center for chronic back pain. (Tr. 822) On examination, Mascio's back range of motion was intact, his neurovascular system was intact distally, and straight leg raising (SLR) testing was negative. (Tr. 823) Dr. Berger diagnosed thoracic spinal stenosis and prescribed a 5-day course of prednisone and Neurontin. He told Mascio to use Motrin or Naproxen, but not both. He encouraged Mascio to make an appointment with his

primary care physician and referred him to Metro Health's Department of Physical Medicine and Rehabilitation ("PM&R"). (Tr. 824)

Mascio met with David M. Kuentz, D.O., on November 27, 2012. He said he was planning to schedule an appointment with PM&R to continue nerve blocks for his pain. In the meantime, he was using Voltaren and Vicodin. Dr. Kuentz also prescribed Wellbutrin. (Tr. 871)

Mascio saw Murray Andrew Greenwood, M.D. on December 3, 2012 for chronic pain, worsening mood and vision changes. (Tr. 811) He had diffuse tenderness over his spine and many major muscle groups. He was mildly positive for numbness in both feet. (Tr. 812) He had full strength in all muscle groups. Dr. Greenwood diagnosed chronic spondylogenic multi-level back and neck pain with facet versus canal stenosis and myofascial features, central pain syndrome, and depression. He planned to schedule x-rays and prescribed Lyrica and physical therapy. (Tr. 813)

X-rays of Mascio's pelvis showed no acute fractures, well maintained joint spaces, and no significant arthritic changes. (Tr. 827) X-rays of Mascio's cervical and lumbar spine showed mild foraminal stenosis in the cervical spine at levels C2-3, C3-4, and C4-4, and disc space narrowing in the lumbar spine at L4-5 and L5-S1. (Tr. 834-835) An x-ray of Mascio's left shoulder showed mild degenerative spurring at the acromioclavicular joint. (Tr. 835)

On January 4, 2013, Mascio saw Charles F. Misja, Ph.D., for a consultative psychological evaluation. (Tr. 789-795) Mascio reported past alcohol abuse but that he had been sober for 20 years. He indicated he'd relapsed the prior year and had been charged with DUI. He stated he had been sober for a year by the time of the evaluation. (Tr. 791) Mascio's history included having been abused as a child. (Tr. 790)

Mascio reported doing most of the meal preparation at home, but he did not help with cleaning or laundry due to problems lifting. He did not drive due to a suspended license. He

liked to watch TV, followed baseball and used Facebook. He managed the family finances and had normal daily grooming, although he required some assistance in the shower. (Tr. 92)

At the exam, Mascio was dressed and groomed appropriately; he was friendly and cooperative. His affect was constricted and he had a mildly depressed mood. Mascio told Dr. Misja that he slept four to five hours a night due to pain. (Tr. 792-793) Dr. Misja diagnosed major depression with alcohol dependence in early remission. (Tr. 793) Dr. Misja assigned a Global Assessment of Functioning score of 50, but opined that Mascio would have only minimal issues with employment due to psychologic factors. He opined that Mascio might experience "minimal to moderate" problems in his ability to respond appropriately to supervision. (Tr. 794)

Mascio saw Murray Greenwood, M.D. on January 14, 2014. Mascio reported progressive back pain. He described the pain at the T4 level radiating up and down. He had numbness and tingling in both legs. (Tr. 801-803) Mascio reported that the pain was worse with walking, sitting or standing for greater than 15 minutes. (Tr. 804) Dr. Greenwood noted no gait clumsiness but observed Mascio was walking with a limp. Mascio walked without an assistive device and moved easily from sitting to standing. He was able to heel, toe, and tandem walk. (Tr. 803-805) Spine and shoulder x-rays showed minimal lumbar degenerative disc disease and left foraminal stenosis and mild degenerative disc disease of the cervical spine. (Tr. 801-802) Straight leg raise testing was mildly positive for numbness in feet on both sides. (Tr. 805) Dr. Greenwood felt Mascio suffered from chronic spondylogenic multi-level back and neck pain with facet versus canal stenosis and myofascial features, central pain syndrome and depression. He prescribed Lyrica and physical therapy. Dr. Greenwood noted that he would not prescribe opioids due to a prior history of cocaine and alcohol addiction. (Tr. 806) An MRI performed on January 28, 2013 showed moderate to severe facet arthropathy in Mascio's cervical, thoracic,

and lumbar spine with thoracic disc extrusion at T5-6 and T6-7. (Tr. 858-859) Mascio's lab work was positive for anti-nuclear antibody. (Tr. 1000)

On February 5, 2013, Dr. Kuentz explained that long term use of Vicodin was not appropriate. (Tr. 851) Mascio reported more frequent heart palpitations or "butterflies" in his chest and Dr. Kuentz noted a family history of coronary disease. (Tr. 851)

Mascio saw Dr. Kuentz again on March 5, 2013, complaining of chronic lumbar, thoracic and cervical pain as well as pain in his hips. Dr. Kuentz noted that Mascio had self-treated in the past with alcohol, but was no longer drinking. Mascio also reported that chronic pain and the winter season caused mood problems. (Tr. 845) Mascio told Dr. Kuentz that he had stopped taking Lyrica due to side effects. He had also stopped taking prednisone and Neurontin. His only relief came from Vicodin. (Tr. 845) Given Mascio's history of substance abuse, Dr. Kuentz wanted Mascio to start weaning off of Vicodin. (Tr. 846)

An EMG study on June 10, 2013 was normal, with no evidence of radiculopathy or polyneuropathy. (Tr. 1069) Mascio returned to Dr. Kuentz on July 9, 2013 for back pain primarily across his upper back and shoulders. (Tr. 1081) Dr. Kuentz continued to express concern about his use of Vicodin. (Tr. 1082)

Mascio followed-up with Dr. Greenwood on August 29, 2013. (Tr. 1112) Mascio complained of numbness in his hands and feet, with fatigue, impaired balance, and occipital headaches. (Tr. 1113) Examination showed 4+/5 strength in Mascio's deltoids and hip extension and 5/5 in the remaining tested muscle groups. Dr. Greenwood noted numerous tender points with intolerance to light touch at the neck, back, hips, and shoulder girdles. Mascio moved slowly from sitting to standing. He was able to heel, toe, and tandem walk. His sensation was intact. (Tr. 1117) Dr. Greenwood diagnosed lumbar facet syndrome, cervical facet arthritis, cervicogenic headache, and myofascial pain lumbar. He opined that epidural injections would

not be highly successful but that nerve blocks might help with a "refresher" physical therapy course. Dr. Greenwood refilled Mascio's pain medication but discussed that he should taper over time. (Tr. 1118)

On October 21, 2013, Mascio started treating with Dr. Vimal Desai and Dr. Brendan Astley, pain management physicians. On exam, Mascio had painful range of motion in his cervical and lumbar spine. He had normal motor and sensory function and a normal gait. (Tr. 1135) Dr. Astley proposed median nerve branch blocks and an injection into the shoulder bursa. (Tr. 1137) Mascio underwent a series of cervical epidural steroid injections in November and December 2013. (Tr. 1163, 1169, 1175-1177) Dr. Astley also performed a trigger point injection into Mascio's left trapezius area on December 13, 2013. (Tr. 1175-1776)

Mascio followed up with Dr. Astley's nurse practitioner, Todd Markowski, on December 23, 2013. Mascio reported that he had better pain relief in the past from injections. He was having headaches every other day. He had full strength in all extremities and normal sensation, but limited range of motion in both shoulders. (Tr. 1181-1183) On February 21, 2014, Nurse Markowski noted that Mascio described gradually worsening pain. (Tr. 1188)

On April 2, 2014, Mascio met with Dr. A. Wright. Mascio reported that epidural injections had not provided any relief. Dr. Wright did not increase in his narcotic medication due to problems Mascio had with constipation. (Tr. 1201) Dr. Wright ordered a "HLA-B27" test to rule out ankylosing spondylitis, a form of inflammatory arthritis. (Tr. 1204) A cervical MRI on April 16, 2014 showed significant facet arthropathy - unchanged from his 2013 MRI with mild foraminal narrowing on the left but no significant foraminal encroachment. (Tr. 1215)

In a May 1, 2014 examination by Dr. Astley (Tr. 1217), he found tenderness to palpation over the paraspinal area. Everything else was normal. Dr. Astley noted that the HLA-B27 test

was positive and referred Mascio to rheumatology for further care. He also increased Mascio's dosage of OxyContin. (Tr. 1219)

Mascio saw a rheumatologist, Dr. Stanley Ballou, on May 30, 2014. Dr. Ballou noted decreased motion in Mascio's neck and lower back and painful range of motion in his shoulders. Mascio walked independently and without difficulty. He had no swelling in his hands or fingers and his grip strength was normal. Dr. Ballou questioned the diagnosis of ankylosing spondylitis because, despite the positive HLA-B27 testing, x-rays did not appear consistent with the disease. Dr. Ballou ordered additional imaging of Mascio's sacroiliac joints. (Tr. 1227)

Mascio's examination findings were unchanged at a follow up examination with Dr. Astley on June 26, 2014. (Tr. 1233-1235) On July 8, 2014, Tyler Gadjos, S.P.T. evaluated Mascio for physical therapy. (Tr. 1245-1249) Mascio had painful and limited range of motion of his spine and shoulders. Mr. Gadjos opined that Mascio's prognosis for therapy was good. (Tr. 1247-1248)

On July 9, 2014, Mascio saw Dr. Michael Harris, M.D., on referral from Dr. Astley for a "disability exam." (Tr. 1253) Mascio's neurological exam was normal except for slightly decreased (4+/5) decreased strength in his hip flexors bilaterally. (Tr. 1256) Dr. Harris noted that conservative treatments had failed and that Mascio was a poor candidate for surgery. Dr. Harris noted Mascio was very focused on his pain and very limited in terms of functional capacity. Dr. Harris commented that Mascio's high dose of Morphine may be a barrier to work because it affected his cognition. (Tr. 1257) Dr. Harris completed a medical source statement after he met with Mascio one time. (Tr. 1240-1241, 1257)

Appointments on August 22, 2014 and October 6, 2014 with Dr. Astley showed unchanged objective findings. (Tr. 1262-1264, 1272)

On November 26, 2014, Mascio met with Dr. Bukola Ojo.  Mascio had normal range of motion in his back but tenderness over his cervical and lumbar area.  His sensation was intact, but his motor strength was 4/5 throughout.  He was only able to lift his shoulders 90 degrees. (Tr. 1290)

Mascio returned to see Dr. Ballou on December 26, 2014.  (Tr. 1300)  Dr. Ballou decided to start Humira infusions – a treatment for ankylosing spondylitis, concluding a positive response to the drug would confirm the diagnosis.  (Tr. 1300)

Mascio had tenderness in the cervical and lumbar region with limited range of motion at a January 15, 2015 appointment with Dr. Astley.  (Tr. 1305)

Mr. Mascio began Humira infusions and felt that they were somewhat helpful.  However, he had developed a skin rash so Dr. Ballou stopped the Humira infusions and ordered a skin biopsy of the rash.  (Tr. 1377)  Examination showed that Mascio had full range of motion of his shoulders, elbows, wrists and fingers but paraspinal tenderness and limited lumbar flexion and knee crepitus.  (Tr. 1378)

On March 16, 2015 at a pain management appointment, Mascio had mildly painful and limited range of motion of his lumbar spine.  (Tr. 1394)  His sensation, reflexes, motor strength, and gait were normal.  (Tr. 1395)

On May 20, 2015, Mascio reported increased back and hip pain.  He had tenderness to palpation over his paraspinal muscles.  (Tr. 1408-1411)  Dr. Astley switched Mascio's medications from OxyContin to Methadone and increased the Norco dosage.  (Tr. 1411)

On July 15, 2015, Mascio had tenderness to palpation of his paraspinal area.  (Tr. 1435) At an office visit on August 13, 2015, Dr. Astley noted that Mascio was getting good pain control but reported symptoms of opiate withdrawal between doses, having sweats, shaking and

stomach pains.  (Tr. 1443)  His examination findings were unchanged.  (Tr. 1445)  He received a left rhomboid trigger injection.  (Tr. 1446)

On September 10, 2015, Mascio reported that the rhomboid injection had provided 50% relief, but he was developing a rash on his right shoulder since starting Humira.  (Tr. 1455) Examination showed normal range of motion, strength, sensation and reflexes, but tenderness to palpation over the paraspinal muscles.  (Tr. 1455-1456)  He received a second rhomboid trigger point injection.  (Tr. 1456)

At an appointment with Dr. Astley on October 28, 2015, Mascio continued to report 50% improvement of his shoulder pain.  (Tr. 1472)  Dr. Astley assessed lumbar spondylosis and recommended walking in the pool at least three times per week for 30 minutes.  (Tr. 1474)

On November 19, 2015, Mascio had tenderness over his cervical spine, but his motor strength, sensation and reflexes were normal.  (Tr. 1487)  He received another rhomboid injection.  (Tr. 1489)  An endocrinology consult on November 27, 2015 showed that Mascio had low testosterone most likely related to chronic opioid use.  (Tr. 1501)

Mascio returned to Dr. Astley on January 14, 2016.  (Tr. 1509)  He had received a letter stating that the clinic would no longer prescribe opioids due to a negative Norco urine drug test. (Tr. 1509)  Mascio insisted that he had properly taken his medications and Dr. Astley noted that he was "very tempted not to believe the lab report," but the policy of the clinic stated that he could no longer prescribe any opiate-based medications.  He instructed Mascio to return to his primary care physician for possible pain medications.  (Tr. 1512)

Mascio went to the Parma Medical Center emergency room on February 14, 2016 for abdominal pain, nausea, and diarrhea.  (Tr. 1342)  A CT scan showed no acute abdominal or pelvic process.  (Tr. 1356)  Mascio reported that he was trying to wean from opiates after his pain management physician refused to prescribe more.  (Tr. 1345)  Despite trying to wean from

opiates, he requested narcotic pain medication. On examination he was "very calm and well-appearing, pleasant and conversant despite reporting 9.5 out of 10 pain." His gait, sensation and strength were normal. (Tr. 1346) His diagnoses included drug seeking behavior and opiate withdrawal. (Tr. 1347)

Mascio went to the Fairview Hospital ER on February 18, 2016 for chest pain. He reported he had recently sought treatment from Parma Hospital for opiate withdrawal symptoms. (Tr. 1320) Mascio had a normal gait, normal speech, normal mood, affect, and behavior. (Tr. 1321) He was assessed with atypical chest pain and admitted for observation over concerns about opiate withdrawal. (Tr. 1322, 1330) Examination showed mild dehydration. (Tr. 1326) Examination the following day was normal. (Tr. 1329) The Ohio Automated Rx Reporting System (OARRS) showed that Mascio had obtained 28 controlled substance prescriptions from 4 different providers and 3 different pharmacies over the previous 12 months. (Tr. 1331) Examination revealed tenderness over his entire spine and sacroiliac joints. (Tr. 1333) He was discharged on February 19, 2016. (Tr. 1335)

Mascio began treating with a new primary care provider, Scott Owens, D.O. on February 23, 2016. Mascio reported overwhelming anxiety, loose stools, and labile blood pressure. He was interested in a second opinion from another pain management doctor. He was taking one to two Tramadol a day in an attempt to wean off of them. (Tr. 1545)

Mascio followed-up with Dr. Owen on March 3, 2016; Dr. Owen indicated Mascio should also wean off of Tramadol. (Tr. 1539-1541) Mascio met with Dr. Owen again on April 11, 2016. Mascio complained of chest tightness and shortness of breath when active. Mascio had not tolerated Cymbalta, which had been prescribed for his anxiety. He requested a referral to a psychiatrist. Mascio's blood pressure was elevated but the examination was otherwise normal.

(Tr. 1533)  Dr. Owen diagnosed exertional angina and ordered a cardiology consult.  (Tr. 1534)

A pharmacologic cardiac stress test performed on April 15, 2015 was normal.  (Tr. 1554)

### C.    Opinion Evidence

#### 1.    Dr. Michael Harris – July 9, 2014.

On July 9, 2014, after meeting with Mascio once, Dr. Michael Harris completed a

medical source statement opining that Mascio was able to lift and carry 10 pounds occasionally

and 5 pounds frequently.  He opined that Mascio was able to stand or walk for no more than 3 or

4 hours total in an eight-hour workday and for no more than 20 minutes without interruption.  He

also limited Mascio's ability to sit to 20 minutes at a time, and to 3-4 hours per shift.  He opined

that Mascio could occasionally balance and could only rarely stoop, kneel, crouch or crawl.  (Tr.

1240)  He opined that Mascio could occasionally reach, push, pull and perform fine and gross

manipulation.  Dr. Harris further opined that Mascio would require additional breaks over and

above the standard work breaks, but he did not specify the length of those breaks.  (Tr. 1241)

#### 2.    Reviewing Physician – Elizabeth Das, M.D. – May 2013

On May 3, 2013, on reconsideration, state agency reviewing physician Elizabeth Das,

M.D. reviewed Mascio's file and opined that he could lift and carry 20 pounds occasionally and

10 pounds frequently, stand and/or walk for 6 hours, and sit for 6 hours in an 8-hour workday.

(Tr. 190)  He could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl.  (Tr. 190)

She opined that he had limited ability to reach due to right shoulder degenerative joint disease.

(Tr. 190)

### D.    Testimonial Evidence

#### 1.    First Administrative Hearing – July 16, 2014

At the first hearing held before ALJ Giuffre, Mascio testified that he had graduated from

high school.  (Tr. 113)  He last worked in November 2011 for a recycling company.  He only

worked there for six weeks, losing his job after an accident in a company vehicle. (Tr. 114) Mascio caused the accident because he could not turn his head far enough to see the other vehicle involved in the accident. (Tr. 114-115) Mascio previously worked as a sales manager for a granite countertop maker and as a territorial sales manager for a cabinet manufacturer. (Tr. 115-116) He also operated his own cabinet making company for a few years but had declared bankruptcy when the business failed. (Tr. 117) Mascio injured his spine when he was working for the granite countertop company. (Tr. 118)

Mascio had a long history of back pain controlled for many years by epidural injections. When he lost his job and insurance, he could no longer get treatments. (Tr. 118) He had little treatment until 2012 due to lack of insurance. (Tr. 121) Now, the injections were no longer working and doctors determined that he had ankylosing spondylitis. (Tr. 122-123) He had been using morphine for pain for two years. (Tr. 123) He also used a TENS unit about twice a week to relieve pain in his back and shoulder. (Tr. 123-124) Mascio's pain was widespread and he was diagnosed with fibromyalgia. (Tr. 119) He

Mascio's daily routine consisted largely of sitting in a chair and watching television. He periodically arose to move around and then lied down in bed. (Tr. 127) Mascio liked to cook; he could stand in the kitchen for about 15 minutes at a time. (Tr. 127-128) He went to the store with his wife. (Tr. 131) He no longer drove due to medication and having difficulty turning his head due to neck pain. (Tr. 130) He could not lift his arms very high due to pain in his shoulders. (Tr. 125-126) His wife helped him bathe and get dressed. (Tr. 131) He had recently had issues with balance and tripping. (Tr. 130)

Vocational expert Ted Macy also testified. (Tr. 134-142) He considered Mascio's prior work to be a sales manager, sales representative, cabinetmaker and cabinetmaker supervisor.

(Tr. 136-138)  Some of these jobs were listed as light or medium, but Mascio performed them at the heavy exertional level.  (Tr. 136-138)

The ALJ asked the VE to consider an individual of Mascio's age, education and past relevant work experience with the capacity to perform light work; occasional climbing ramps and stairs; occasional stooping, kneeling, crouching; no climbing ladders, ropes or scaffolds and no crawling.  He had the ability to raise both upper extremities just below shoulder level occasionally and needed a sit-stand option.  (Tr. 138)  The VE opined this individual could not perform Mascio's prior work but could perform other jobs that were available in significant numbers.  (Tr. 138-139)  The VE acknowledged that the number of available jobs would be significantly reduced if the individual needed to stand every 10 to 15 minutes.  Most jobs would be eliminated if the individual needed to periodically lie down.  A worker who was off task more than 20% of the time could not be competitively employed.  (Tr. 141)

### 2.    Second Administrative Hearing – June 8, 2016

At the second administrative hearing, Mascio testified that his overall physical abilities had decreased since the first hearing.  (Tr. 76-77)  He was less active than he had been at the time of the first hearing and was not doing as much cooking.  (Tr. 77)  Mascio was using a cane when outside his apartment.  His doctor was aware that he was using the cane but had not prescribed it.  (Tr. 66)

Mascio stopped using narcotics because he was concerned about effects they were having on his body.  (Tr. 67-68)  Mascio's pain had increased since stopping opioids.  (Tr. 66)  To lessen pain, Mascio took hot showers, used Epsom salts, and stayed off his feet as much as possible.  (Tr. 68)  He also took ibuprofen, Lodine, and Humira every two weeks.  (Tr. 74)  The narcotics had apparently masked high blood pressure.  (Tr. 70)

Mascio stated that he had been experiencing increased anxiety and had an appointment scheduled with a psychiatrist. (Tr. 68-69) He spent the majority of time in bed propped up at a 30 degree angle, watching TV or using his laptop computer. (Tr. 79) Mascio estimated that he could stand for about 15 minutes before he needed to sit for an equal amount of time before standing again. (Tr. 88)

Mascio testified he was seeing Dr. Ballou, a rheumatologist, for his diagnosis of ankylosing spondylitis. Dr. Ballou prescribed Humira. At first, Humira caused Mascio to develop a rash, but he continued taking it when his rashes subsided. (Tr. 75)

VE Brett Salkan also testified at the second hearing. (Tr. 94-105) The VE classified Mascio's past work similarly to the opinions of the VE at the first hearing. The ALJ asked a similar hypothetical question except that the individual was limited to crawling on an occasional basis and the new hypothetical did not include a sit/stand option. (Tr. 96-97) VE Salkan opined that this worker would be able to perform Mascio's past work as described by the DOT but not as he had actually performed them. (Tr. 97) If reaching overhead and in all directions was limited to occasionally, none of the past work could be performed. However, this individual would be able to perform other work such as a furniture rental clerk, an usher, and a children's attendant. (Tr. 97-98) If the individual needed to alternate between sitting and standing every 15 minutes, then light work was precluded. (Tr. 98-99) If the restriction to only occasional reaching in all directions was added, then no jobs would be available. (Tr. 101-102) The VE opined that using a cane would only have a nominal effect on sedentary work, but would eliminate the ability to do light level jobs. (Tr. 105)

## IV.    The ALJ's Decisions

### A.    October 31, 2014 Decision

The pertinent parts of the ALJ's first decision stated:

1. Mascio had not engaged in substantial gainful activity since May 1, 2009, the alleged onset date. (Tr. 199)

2. Mascio had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine, and degenerative joint disease of the shoulders. (Tr. 200)

4. Mascio had the residual functional capacity to perform light work. He could sit for a total of six hours and stand or walk in combination for a total of six hours in an eight hour workday, with normal breaks. He could lift and carry up to 20 pounds occasionally and 10 pounds frequently, except he could never climb ladders, ropes or scaffolds, or crawl. He could occasionally climb ramps and stairs and stoop, kneel, and crouch. He could occasionally raise both upper extremities just below shoulder level and required a sit/stand option. (Tr. 203)

5. Mascio was unable to perform past relevant work. (Tr. 210)

8. Transferability of job skills was not material because Mascio was not disabled, whether or not he had transferable job skills. (Tr. 211)

9. Considering Mascio's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 211)

The ALJ determined that Mascio had not been under a disability since May 1, 2009. (Tr. 212)

**B.     Appeals Council Remand**

On February 12, 2016, the Appeals Council remanded the case to the ALJ for three

reasons:

1. There was an apparent unresolved conflict between the ALJ's reaching limitation in Mascio's RFC and the jobs that the VE and ALJ determined that he was capable of performing;

2. The ALJ did not sufficiently explain the need for or particulars of the sit/stand option she included in Mascio's RFC; and

3. Mascio submitted new and material evidence related to his cervical impairment.

(Tr. 218-221)

### C.    July 11, 2016 Decision

After remand, the ALJ issued a second decision.  The only differences in the two decisions were in the identification of Mascio's severe impairments and in the determination of his RFC.  The ALJ determined that Mascio had the following severe impairments: cervical facet arthropathy, lumbar facet arthropathy, and bilateral shoulder arthritis.  (Tr. 44)  She determined he had the RFC to perform light work except he could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop, crouch, kneel, and crawl and could occasionally reach in all directions, bilaterally.  (Tr. 46)  The ALJ also omitted the sit/stand option from Mascio's RFC.  She once again determined that Mr. Mascio had not been under a disability since May 1, 2009.  (Tr. 50)

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).  The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3

(6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

## B.    Treating Physician Rule[1]

Mascio argues the ALJ failed to properly apply the treating physician rule when evaluating the opinion of Dr. Harris. The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Mascio filed his claim before the revision took effect.

record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6). The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ( ("In addition to balancing the factors to determine what weight to give a treating source opinion [when controlling weight has been denied,] the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

ALJ Giuffre discussed Dr. Harris's opinion as follows:

The record contains a *treating source opinion* from Dr. Michael Harris, dated July 17, 2014, at Exhibit 12F. He opined the claimant was capable of only significantly less than sedentary level activities.

The undersigned finds that the opinion of Dr. Harris is inconsistent with the other substantial evidence of record. Therefore, it is not entitled to controlling weight. (SSR 96-2p)

Specifically, on July 9, 2014, Dr. Harris examined the claimant at the request of the claimant's pain management specialist, Dr. Astley. He completed his *treating source statement* based upon his findings. He found decreased range of motion in the cervical and lumbar spines. However, he also reported the claimant had normal muscle strength, normal sensations, and normal reflexes. (Ex 14F pages 10-13).

As indicated, *supra,* the claimant was neurologically normal as late as February 2016 (Ex. 16F page 7). The opinions of Dr. Harris overstate the claimant's limitations based upon the underlying objective findings.

(Tr. 22, emphasis added)

The Commissioner correctly points out that Dr. Harris was not Mascio's treating physician. He met with and examined Mascio once to complete a medical source statement at Dr. Astley's request. (Tr. 1253) The regulations recognize that the nature and extent of a treating relationship is relevant to the weight given to physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). A treating source is one who sees a claimant with a frequency consistent with accepted medical practice for the claimant's medical condition. 20 C.F.R. §§ 404.1502, 416.902. Dr. Harris met with Mascio once. Mascio fails to point to any case law or other support suggesting that Dr. Harris should be considered a treating physician in this case. Although the ALJ erroneously referred to Dr. Harris as a treating source, the facts plainly require the opposite different conclusion. And though the ALJ erred in calling Dr. Harris a treating source, the ALJ did not err in determining that Dr. Harris's medical source statement was not entitled to controlling weight.[2] *See Rudd v. Comm'r,* 531 Fed. App'x 719, 729 (6th Cir. 2013).

Even if Dr. Harris could be considered a treating physician (for example, by considering him somehow to be an agent of his partner, treating source Dr. Astley), the ALJ did not err in

---

[2] Mascio also argues that the ALJ was required to identify the weight she did assign to the opinion of Dr. Harris. However, such a requirement would only apply if Dr. Harris was a treating physician. *See Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 551-552 (6th Cir. 2010).

deciding not to give his opinion controlling weight because she found that his opinion was "inconsistent with other substantial evidence in [the] case record."  *Wilson,* 378 F.3d at 544 (6th Cir. 2004).  She also pointed to inconsistent evidence in the record.  Dr. Harris himself determined that Mascio had normal strength, normal sensations and normal reflexes.  (Tr. 1256)  Mascio argues that the ALJ misread Dr. Harris's notes, but the court disagrees.  Dr. Harris noted normal strength in both of Mascio's upper and lower extremities.  He noted nearly normal (4+/5) strength in Mascio's hip flexors.  (Tr. 1256)  These findings do not support Dr. Harris's opinion that Mascio was limited to lifting 10 pounds occasionally and 5 pounds frequently.  (Tr. 1240)  Thus, the ALJ properly pointed to an inconsistency between Dr. Harris's opinion and the record of his own examination findings.  Mascio attempts to counter this by citing evidence in the record that *is* consistent with Dr. Harris's opinion.  ECF Doc. 12, Page ID# 1635.  But, even if this evidence could support another conclusion, the decision of the ALJ must stand if the evidence could reasonably support her conclusion.  *See Key,* 109 F.3d at 273 (6th Cir. 1997).

In support of her conclusion that Dr. Harris's opinions were not entitled to controlling weight, the ALJ also cited an emergency room record stating that Mascio had "no obvious neurological deficits, normal sensation and strength bilaterally."  (Tr. 1346)  Mascio contends the ALJ improperly relied on this evidence because it was from an ER visit related to Mascio's heart, not one addressing his back symptoms.  Nonetheless, it appears that the emergency room physician reviewed Mascio's systems and documented a relatively normal exam.  He observed normal gait with no antalgia, no obvious deficits, normal sensation and strength bilaterally.  (Tr. 1346)  There is nothing to suggest this medical record inaccurately documented Mascio's condition in February 2016.  Nor has Mascio cited case law holding that an ALJ must disregard emergency room records when a claimant seeks treatment for something other than the allegedly disabling condition.  As noted already, the ALJ's decision cannot be overturned if the evidence

could reasonably support her decision.  The ALJ did not err in citing Mascio's emergency room records to support her conclusion that Dr. Harris's opinions were not entitled to controlling weight.

Finally, Mascio contends that the ALJ placed too much significance on the fact that he had not had surgery to alleviate his pain.  The ALJ stated that Mascio "had not undergone surgery, because he has not required any."  Mascio complains that the ALJ used this fact as a reason to doubt the severity of his problems.  ECF Doc. 12, Page Id. 1636.  But this may be more a case of Mascio making too much of the ALJ's statement than of the ALJ misinterpreting medical evidence.  The fact is undisputed that Mascio has not had surgery.  Mascio points to no evidence suggesting surgery had been recommended.  The ALJ notes this in her decision - as one of several statements supporting her conclusion.  It is unclear how a statement about a lack of surgery somehow contradicts the ALJ's decision to assign less than controlling weight to the opinion of Dr. Harris.  Dr. Harris himself noted that Mascio was not a good candidate for surgery.  (Tr. 1257)  Mascio argues that he was not a good candidate because he suffered from facet disease – not from a discrete disc herniation.  ECF Doc. 12, Page ID# 1636.  But Dr. Harris's notes do not indicate why he was not a good candidate.  And, even if they did, the ALJ's statement that Mascio had not required surgery was accurate.  The ALJ did not err in noting that Mascio had not required surgery.

As indicated above, there is a "zone of choice," within which the ALJ may decide a case without interference from the courts.  *McClanahan,* 474 F.3d at 833.  The ALJ did not err in assigning less than controlling weight to the opinion of Dr. Harris.  To the contrary, it would have been error to assign controlling weight to Dr. Harris's opinions because he was not a treating source.  And because Dr. Harris was not a treating source, the ALJ was not required to provide good reasons for the weight assigned to his opinions.  Nevertheless, the ALJ explained

her decision and cited to specific records showing that Dr. Harris's opinion overstated Mascio's limitations. (Tr. 47) Tus, the ALJ adequately supported her decision to assign less than controlling weight to the opinion of Dr. Harris.

### C. Residual Functional Capacity Omitting a Sit/Stand Option

Mascio next argues that the ALJ erred by failing to include a sit/stand option in Mascio's RFC. Mascio argues that Dr. Harris's opinion and his own testimony at the second hearing supported a need for a sit/stand option. He contends that this omission is significant because the VE at the first hearing opined that a person would be limited to sedentary work if he needed to alternate between sitting and standing every 10 to 15 minutes. Mascio also points to the fact that the first ALJ decision included a sit/stand option. (Tr. 203) The Appeals Council remanded the first decision and indicated that the ALJ "should clarify whether the need to alternate sitting and standing is medically supported. If so, the [RFC] finding should specify the length of time and the frequency with which the claimant needs to alternate positions." (Tr. 220) Despite this instruction, the ALJ's second decision neither mentioned nor included any sit/stand option.

Although it is unclear why the ALJ omitted the sit/stand option in her second decision,[3] this court's task is to review the *final* decision of the Commissioner. It is "well established" that an Appeals Council's remand order is not a final decision of the Commissioner. *King v. Comm'r of Soc. Sec.*, No. 1:09-cv-871, 2010 U.S. Dist. LEXIS 80484, 2010 WL 3210938, at *3 (W.D. Mich. June 29, 2010) (citing *Weeks v. Soc. Sec. Admin.*, 230 F.3d 6, 7-8 (1st Cir. 2000) and *Duda v. Sec'y of Health & Human Servs.*, 834 F.2d 554, 555 (6th Cir. 1987)). "Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises

---

[3] The Regulations provide that "the administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." *Brown v. Comm'r of Soc. Sec.*, No. 1:08CV183, 2009 U.S. Dist. LEXIS 14046, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009) (quoting C.F.R. § 416.1477(b)).

prior to the issuance of the agency's final decision." *Brown*, 2009 U.S. Dist. LEXIS 14046, 2009 WL 465708, at *6. Thus, for purposes of this appeal, the court may only determine whether substantial evidence supported the ALJ's July 11, 2016 decision.

This court's scope of review "is limited to an analysis of the ALJ's decision and not a review of the ALJ's compliance with the Appeals Council's Order of Remand." *Peterson v. Comm'r of Soc. Sec.*, No. 09-11222, 2010 U.S. Dist. LEXIS 7839, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29, 2010) (citing *Riddle v. Astrue*, No. 2:06-00004, 2009 U.S. Dist. LEXIS 26096, 2009 WL 804056, at *19 (M.D. Tenn. Mar. 25, 2009)). *See Dyer v. Sec'y of Health & Human Servs.*, 889 F.2d 682, 684 (6th Cir.1989); *Dishman v. Astrue*, No. 4:08-cv-58, 2009 U.S. Dist. LEXIS 76830, 2009 WL 2823653, at *11 (E.D. Tenn. Aug. 27, 2009); *Brown*, 2009 U.S. Dist. LEXIS 14046, 2009 WL 465708 at *6 ("By failing to remand the matter a second time, it appears the Appeals Council considered the ALJ's [decision] to be in compliance with the Council's previous order of remand [and] Section 405(g) does not provide this court with authority to review intermediate agency decisions that occur during the administrative review process."). Because an Appeals Council's order to remand is a function of inter-agency review and does not constitute a "final decision," this court may not decide whether the ALJ fully complied with the mandates in the Appeals Council's remand order. Mascio does not cite any case law in his brief, and this court is not aware of any authority, permitting the court to review the ALJ's compliance with the Appeals' Council's remand order.

The question then becomes whether the ALJ determined Mascio's RFC based on the evidence as a whole. The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). The regulations require the ALJ to evaluate several factors in determining the RFC, including all medical evidence (not limited to medical opinion testimony) and the claimant's

testimony.  *See Henderson v. Comm'r,* No. 1:08 CV 2080, 2010 U.S. Dist. LEXIS  18644, *7

(N.D. Ohio, March 1, 2010) citing, *Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 633 (6th Cir.

2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The final responsibility

for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 416.927(e)(2).  But the

ALJ does not fulfill her responsibility when she doesn't consider all of the medical evidence in

the record.

Mascio argues that Dr. Harris's assessment "impliedly includes the need for a sit/stand

option" and that his own testimony established that he could only sit and/or sit for 15 minutes at

a time.  ECF Doc. 12, Page ID# 1638.  However, as already explained, the ALJ was not required

to give controlling weight to Dr. Harris's opinion.  Moreover, it is not entirely clear that Harris's

opinion even required a sit/stand option.  On the first page of his Medical Source Statement, Dr.

Harris wrote that Mascio could stand/walk and/or sit for 20 minutes without interruption.  (Tr.

1240)  However, on the second page, he left blank the part of the questionnaire asking whether

Mascio needed to be able to alternate positions between sitting, standing and walking at will.

(Tr. 1241)  The ALJ did not err in failing to include this limitation in Mascio's RFC.

Regarding Mascio's own testimony, the ALJ was not required to accept, at face-value,

Mascio's statements regarding his need to alternate between sitting and standing.  The ALJ

considered Mascio's testimony including his testimony that he could only stand for 15 minutes at

a time and sit for 15-20 minutes, but found that his statements, concerning the intensity,

persistence and limiting effects of his symptoms were not entirely consistent with the medical

evidence and other evidence in the record.  (Tr. 47)  The ALJ's credibility findings are entitled to

deference because she had the opportunity to observe Mascio and assess his subjective

complaints.  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001).  The ALJ cannot decide

credibility based solely upon an "intangible or intuitive notion about an individual's credibility."

Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.  Rather, such determinations must find support in the record.  When a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."

The regulations set forth factors that the ALJ should consider in assessing credibility. These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain.  20 C.F.R. § 416.929(c)(3)(i)-(vi).  If the ALJ rejects the claimant's complaints as not fully credible, she must clearly state her reasons for doing so.

The ALJ's decision states:

> The claimant cannot perform medium or heavy work due to his arthritic changes. However, his capacities for light work, with the limitations cited above, are maintained.  He has never undergone surgery, because he has not required any. He is neurologically intact.  As indicated, the claimant appeared at the hearing using a cane.  However, he testified the cane was not prescribed for him.  He testified he began using the cane in February 2016.  However, his treatment notes in February 2016 show a normal gait without the requirement for assistive devices.  (Ex. 16F page 7).  The claimant's electrodiagnostic studies are normal. (Ex. 2F page 52 and Ex. 9F page 207).

> Under SSR 16-3p, the undersigned is obliged to consider the claimant's subjective complaints of pain.  Dr. Astley had prescribed the claimant opioid medication. Sometime before January 2016, the claimant received a letter from Dr. Astley indicating the claimant would no longer be prescribed these medications.  The reasons for the letter was that the claimant had twice failed his tox screen.  The tox screen showed the claimant was not taking his medications.  (Ex. 18F page 133).

> * * *

> "OARRS (Ohio Automated Prescription Reporting System) Report was reviewed. Patient has received 28 controlled substance prescriptions from 4 different providers, filled at 3 pharmacies over the past 12 months.  The most recent opioid

prescription was filled on 1/5 for OxyContin prescribed by Dr. Markowski." (Ex. 15F page 14).

The claimant does have a past history of cocaine abuse. (Ex. 2F page 43).

At the hearing, the claimant adamantly asserted he had always taken his medications properly. In any event, he is currently not on any prescription pain medications (Testimony). He treats his pain with hot showers and Epson salts (Testimony).

(Tr. 48)

After indicating that she did not find Mascio's statements regarding the severity of his symptoms to be fully supported by the evidence in the record, the ALJ referred to records showing normal or mild findings and conservative treatments. She also pointed to evidence in the record arguably showing Mascio's lack of credibility. As noted above, the court must defer to the ALJ's credibility findings because she had the opportunity to observe Mascio and assess his subjective complaints. Here, the ALJ concluded that Mascio's pain and physical limitations were not as severe as he represented. This finding is not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001). The ALJ stated objective reasons for her credibility determination and it will not be reversed.

This court is limited to reviewing the final decision of the Commissioner. Mascio argues that the ALJ should have included a sit/stand option in his RFC. But making an RFC determination was the ALJ's responsibility, ALJ and her determination was supported by substantial evidence. She did not err in failing to assign controlling weight to the opinion of Dr. Harris or to the statements made by Mascio in the administrative hearing. Mascio has failed to identify any errors in the ALJ's application of legal standards.

## VI.    Conclusion

The ALJ properly determined the opinion of Dr. Harris was not entitled to controlling weight and her residual functional capacity determination was supported by substantial evidence in the record.  For these reasons and because Mascio has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

**IT IS SO ORDERED.**


Dated: June 20, 2018

Thomas M. Parker
United States Magistrate Judge